## WARNER v. CITY OF NEW ORLEANS.

(Circuit Court of Appeals, Fifth Circuit. May 17, 1898.)

No. 691.

**1. Equity—Maxims.**

The city of New Orleans purchased the drainage system then in process of construction from the contractor; paying therefor in warrants, and covenanting not to obstruct or impede, but to facilitate by all lawful means, the collection and application of the drainage assessments to the payment of the warrants. The city abandoned the work, and the supreme court of the state decided that the assessments were not enforceable, because the abandonment of the work had rendered it a detriment, rather than a benefit, to the lands. Suit was brought against the city by a holder of the purchase warrants. *Held* that, under the maxim "that equity looks upon that as done which ought to have been done," the city must be treated as having done whatever was necessary to render the assessments available, and therefore as liable to account for the fund as if actually collected and in hand.

**2. Estoppel.**

A city, by drawing warrants against a fund composed largely of assessments and judgments against itself as quasi owner of the streets and public squares, etc., is estopped to deny the validity of those assessments and judgments.

**3. Municipal Corporations—Assessment of City Property for Local Benefits.**

A city is liable for special assessments against itself for local benefits to its streets and other public places, regardless of the rule that public property is exempt from taxation.

**4. Same—Increase of Debt.**

By an amendment to the Louisiana constitution, the city of New Orleans was prohibited from increasing its debt, except that it might issue drainage warrants under a certain contract then in process of completion. *Held,* that a purchase of works being built, and the issuance of warrants for the price, were within the exception.

**5. Same—Power to Contract.**

A municipal corporation which has enjoyed the fruits of a contract fairly made cannot, when called to account, deny the corporate power to make it.

**6. Limitations.**

A city bought property, and issued warrants against a fund in payment therefor, and undertook to collect the judgments and assessments belonging to such fund, and apply them to pay the warrants. *Held,* that the city

could not avail itself of the plea of the statute of limitations against the holders of the warrants, based on the fact that the city had allowed the judgments to outlaw.

Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

The legislature of the state of Louisiana, by an act approved March 18, 1858, established a system of drainage of certain portions of the parishes of Orleans and Jefferson, which was to be carried on by boards of commissioners appointed for the three drainage districts into which the territory was divided. The commissioners were required to prepare plans of the proposed work, giving the names of the proprietors of the lands to be drained, which were to be filed in the mortgage office. The act further provided that notice of the filing of the plans should be given by publication, and that, upon the application of the commissioners to the courts specified in the act, judgments should be entered decreeing the lands subject to a first mortgage lien and privilege for such amount as might be assessed for drainage purposes. By a supplemental act approved March 17, 1859, the commissioners were authorized to borrow money to carry on the work. By another act, approved March 1, 1861, the prior acts were amended for the purpose of providing a mode of enforcing assessments when made, and for that purpose authorizing the commissioners to apply to certain courts for the approval and homologation of the assessment rolls, which approval and homologation the act declared "shall be a judgment against the property assessed and the owners thereof, on which execution may issue as on judgments rendered in the ordinary mode of proceeding." The commissioners made plans of the work proposed to be done, including therein the streets, squares, and public places within the several districts, as the property of the city of New Orleans; and from time to time judgments were rendered charging these public places, as well as private property, with the amounts that might be assessed for drainage purposes. Subsequently assessments were made, in some districts by the commissioners, and in others by the board of administrators of the city of New Orleans, which succeeded them under the act of 1871; and judgments were rendered for the amounts assessed against the lands and the owners, pursuant to the act of 1861. These assessments in every instance included the streets, squares, and public places, and the city of New Orleans, as the proprietor thereof. In 1871 the legislature, by Act No. 30 of that year, abolished the several boards of drainage commissioners, transferring all the assets and everything appertaining to the drainage districts to the board of administrators of the city of New Orleans, which was subrogated to all the rights and powers and facilities then possessed by the commissioners; and the board was directed to collect the balance due on assessments, as shown by the books of the First, Second, and Third drainage districts, "which said assessments are hereby confirmed and made exigible at such time and in such manner as the board of administrators may designate." The act further authorized the board of administrators to make other assessments, and required it to place all collections of drainage assessments to the credit of the Mississippi & Mexican Gulf Ship-Canal Company,—said company being the corporation charged under the act with the drainage work,—and hold the same as a fund to be applied to drainage purposes. Under these several acts, assessments were made against the city on the area of the streets and other public places within the drainage districts, and reduced to judgment, to the amount of $696,349.30, and against private persons to the amount of $1,003,342.28, of which about $230,000 has been collected from private property, in cash and drainage warrants; leaving outstanding at the date of the filing of the bill in this case uncollected assessments to the amount of $1,469,714.47, of which the city owes $696,349.30. The canal company carried on the work until 1872, when it transferred its franchise, drainage boats, and machinery to Warner Van Norden, who thereafter continued the work, receiving warrants against the drainage fund in payment of the amount earned. In 1876, after more than two-thirds of the drainage system had been completed, the legislature, by Act No. 16 of that year, authorized the city of New Orleans to acquire, if the council deemed it

advisable, the property and franchise of the canal company, or its transferee, at a valuation to be affixed by appraisers to be appointed by itself; the price to be paid in warrants drawn against the drainage assessments. The same act granted the city the right and power thereafter to do all necessary drainage work, in case it should make the purchase. The city availed itself of this authority, and on the 6th day of June, 1876, made the purchase at an appraised value of $300,000, and issued drainage warrants to that amount to Van Norden for the price; covenanting in the act of sale not to obstruct or impede. but on the contrary to facilitate by all lawful means, the collection and application of the drainage assessments to the payment of the purchase warrants.

On this state of facts the complainant, as holder of $6,000 of these warrants, brings this suit. The bill, after reciting these facts, avers, in substance, that upon acquiring the drainage plant and franchises of the canal company the city abandoned all drainage work, and suffered the dredge boats and machinery purchased as above stated to decay and become valueless, and that by reason of the city's failure to complete the drainage and benefit the lands the courts have refused to enforce the collection of the assessments; that, having thus abandoned all drainage work, the city, by its ordinances and by a proclamation of the mayor, then advised property holders not to pay the assessments; and that in consequence of these ordinances and said proclamation, and the decisions of the courts, the drainage assessments became practically valueless and uncollectible. The bill further avers that the city had issued bonds in exchange for drainage warrants given for work, prior to the sale, under the authority of the act of the legislature of 1872, to an amount in excess of all the drainage assessments, which it will claim operated as a discharge of its liability as assessee of the streets, etc., and of all liability it may have incurred by any dereliction of duty in regard to the assessments against private property. but that this claim was not made known to Van Norden at the time of the purchase, and that he would not have parted with his property payable out of drainage assessments if he had known that such claim would be set up to defeat the payment of the price. The bill closes with a prayer for an accounting of the drainage fund, including the amounts due by the city, and the application thereof to the payment of the complainant's warrants, and those held by others similarly situated who may come in and avail themselves of the benefit of the bill.

To this bill the defendant filed a demurrer, both general and special, assigning for cause (1) want of jurisdiction in the circuit court; (2) want of equity in the bill; and (3) that the matters sought to be litigated had been decided adversely to the complainant's pretensions in the case of Peake v. City of New Orleans, 139 U. S. 342, 11 Sup. Ct. 541. The demurrer was sustained and the bill dismissed by the circuit court, and the cause was removed here on the appeal of the complainant. This court, being in doubt as to the application in Peake v. City of New Orleans, supra, to the case made by the bill, certified the following questions to the supreme court for advice and instructions: "First. Is the city of New Orleans, under the warranties, express and implied, contained in the contract of sale of June 7, 1876, by which she acquired the property and franchise from Warner Van Norden, and under the averments of the bill, estopped from pleading against the complainant the issuance of bonds to retire $1,672,105.21 of drainage warrants issued prior to said sale, as a discharge of her obligation to account for drainage funds collected on private property, and as a discharge of her own liability to that fund as assessee of the streets and squares? Second. Should the decision in the case of Peake v. City of New Orleans, 139 U. S. 342, 11 Sup. Ct. 541, be held to apply to the facts of this case, and operate to defeat the complainant's action?" The court declined to answer the second question, on the ground that it practically submitted the whole case, but answering the first, after reciting the facts, said: "And now the question is whether the city is not estopped to plead in defense of liability on these drainage warrants the fact of prior issue of bonds to a larger amount than that assessed against the areas of its streets and squares, and collected from private property. We think this question must be answered in the affirmative. The city, in respect to the purchase of this property from the canal company and its transferee, and in the obliga-

tions assumed by the warrants issued, acted voluntarily. It was not in reference to these matters, as it was to those considered in Peake v. City of New Orleans, 139 U. S. 342, 11 Sup. Ct. 541, a compulsory trustee, but a voluntary contractor; and the proposition which we affirm is that one who purchases property, contracting to pay for it out of a particular fund, and issues warrants therefor payable out of that fund,—a fund yet partially to be created, and created by the performance by him of a statutory duty,—cannot deliberately abandon that duty, take active steps to prevent the further creation of the fund, and then, there being nothing in the fund, plead in defense to a liability on the warrants drawn on that fund that it had, prior to the purchase, paid off obligations theretofore created against the fund. Whatever equity may do in setting off, against all warrants drawn before this purchase from the canal company and its transferee, the bonds issued by the city (and in respect to that matter we can only refer to Peake v. City of New Orleans, supra), it by no means follows that the city can draw new warrants on the fund in payment for property which it voluntarily purchases, and then abandon the work by which alone the fund could be made good, resort to means within its power to prevent any payments of assessments into that fund, and thus, after violating its contract promise not to obstruct or impede, but on the contrary facilitate by all lawful means, the collection of the assessments, plead its prior issue of bonds as a reason for evading any liability upon the warrants.    One who purchases property, and pays for it in warrants drawn upon a particular fund, the creation of which depends largely upon his own action, is under an implied obligation to do whatever is reasonable and fair to make that fund good. He cannot certainly so act as to prevent the fund being made good, and then say to his vendor, 'You must look to the fund, and not to me.' We are clear in the opinion, therefore, that the first question must be answered in the affirmative." Warner v. City of New Orleans, 17 Sup. Ct. 892.  Being thus advised, and being satisfied that the complainant was entitled to the relief prayed, this court itself answered the second question in the negative, reversed the decree appealed from, and directed the circuit court to overrule the demurrer. See Warner v. City of New Orleans, 26 C. C. A. 508, 81 Fed. 645.  The city subsequently filed an answer at great length, admitting that judgments were rendered against it, as alleged in the bill, for the amount assessed against the streets, squares, and public places, but alleged that the assessments first levied by the commissioners, and afterwards extended by the board of administrators to the city, were null and void because levied on public property exempt from taxation, and that the judgments against the city therefor were for the same reasons also void.  The answer further alleges that the city has performed its full duty in relation to the collection of assessments against private property, but admits that the proclamation referred to in the bill, advising property owners not to pay drainage assessments, was issued by the mayor under authority of an ordinance of the city.  It further alleges that the drainage plans made by the canal company were so defective that their completion would have been of no benefit to the property attempted to be drained; that the work done under them was also defective and of no value, and that for these reasons the city was justified in suspending the further prosecution of the work, which resulted in the decision of the supreme court in the case of Davidson v. City of New Orleans, 34 La. Ann. 170, declaring judgments for drainage assessments void for failure of consideration; and that this decision has become the settled rule of law in the state, rendering further collections impossible, but that notwithstanding this decision the city has constantly and at all times endeavored in every way possible to realize the assessments.  And the city files an account showing the collections made in 1871 to June 20, 1891, inclusive, and the disposition thereof, as a sufficient compliance with its duty as a trustee. In conclusion the city pleads the appointment of a receiver for the drainage fund by the circuit court, and the prescription of five and ten years in bar of the bill, and the issuance of the bonds under the act of 1872, as a discharge from all liability, and the decision in Peake v. City of New Orleans as res adjudicata on all the issues in the case.

Richard De Gray, Wm. Grant, and John D. Rouse, for appellant.
Branch K. Miller and Samuel L. Gilmore, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, **and** SWAYNE, District Judge.

SWAYNE, District Judge (after stating the facts as above). As to nearly all of these defenses, we might well rest our decision in this case on the opinion of the supreme court expressed in answer to the certified question. All the facts averred in the bill have either been admitted by the answer, or abundantly established by evidence. Indeed, the only fact in dispute between the parties is the question of responsibility for the alleged defects in the drainage plan. So far, however, as the answer attempts to fasten this responsibility on the canal company and Van Norden, its transferee, as a defense to this action, it is entirely unsupported by the evidence, as the counsel for the city very frankly admitted in their argument at the hearing. The general plan under which the work was undertaken by the contractor was prescribed by the legislature in the act of 1871, which directed the canal company to dig canals above, below, and in the rear of the city, and with the earth removed therefrom to build levees to protect the city from overflow, and to dig such interior canals as might be necessary for the drainage of the city and the lands in the rear; but the right to prescribe the location and number of all the canals was expressly vested in the city. As a matter of fact, the city, through its ordinances, based on the recommendation of the city engineer, located each of the canals that were excavated, and exercised direct supervision over the work, which the assistant engineer having charge of the work says was done strictly in accordance with the specifications furnished by the contractor, and well done. The principal objections made to the plan by some of the eminent engineers who have testified are that it was not sufficiently extensive to meet the future requirements of a growing city like New Orleans, that it did not provide the number of interior canals necessary to hold and carry off the excessive rainfall, and that the method of discharging the drainage water by means of pumps into the lake was too expensive, and was wrong from a sanitary point of view. Testifying by the light of experience and investigation made by them since 1871, they give it as their opinion that a greater number of canals should be excavated than called for by the plan, and that the drainage ought to be discharged into Bayou Bienvenue, some distance below the city proper, through the main canal, by means of a series of pumping stations. Other engineers of equal reputation—notably, Mr. Bell, who, as engineer of the city in 1871, devised the plan now condemned, and the present city engineer, and others—testify that the plan was a good one, and, if carried out, would have accomplished the drainage of the city. The cost of completing the work after the city purchased the drainage plant, as testified to by some of the witnesses for the defendant, would have been about $500,000, if paid for in cash, and not in warrants. But it now appears that a new plan of drainage has recently been adopted, which, incorporating and using all the old works, is estimated to cost about $8,000,000. Without commenting further on the evidence on this part of the defense, our conclusion is that the plan under which the work was done by the canal company and its

87 F.—53

transferee would, if carried out as contemplated, have sufficiently accomplished the drainage of the lands within the several districts to render the assessments available, if the city had kept the work in serviceable condition after its completion, as the law required. It is a singular fact that, while the answer in this case charges the failure of the drainage to the alleged defective plan and the work of the contractor, the principal ground of the decision in Davidson v. City of New Orleans, 34 La. Ann. 170, for annulling the judgment for one of these assessments, is that the city had abandoned the work, without any probability of renewing it, so that the work, in its incomplete state, was a detriment, rather than a benefit, to the lands. The failure of consideration which worked the destruction of the drainage fund was therefore, as adjudged by the supreme court of the state, caused directly by the fault of the city. Its conduct in this and other respects was a violation of its duty as a trustee, and was a breach of the covenant contained in the act of purchase, "not to obstruct or impede, but on the contrary to facilitate by all lawful means, the collection of the drainage assessments." Treating the city, therefore, as a trustee, under an express duty to do whatever was reasonably required to make the drainage fund available for the purpose of paying the purchase warrants, a court of equity will apply the maxim "that equity looks upon that as done which ought to have been done." "The true meaning of this maxim is that equity will treat the subject-matter, as to all collateral consequences and incidents, in the same manner as if the acts contemplated by the parties had been executed exactly as they ought to have been.    *    *    * They are also deemed to have the same consequence attached to them, so that one party, or his privies, shall not derive benefit by his laches or neglect, and the other party, for whose profit the contract was designed, shall not suffer thereby." 1 Story, Eq. Jur. § 64g. The city must therefore be treated as having done whatever was necessary to render the assessments available, and should be held to account for the drainage fund, as if collected and in hand.

It is claimed, however, that the city is not bound to account for the assessments and judgments against itself, as the quasi owner of the streets and other public places, on the ground that such assessments and judgments should be considered void ab initio, for the reason that public property is exempt from taxation. But we think the city, by drawing these warrants against the drainage fund, composed largely of these very assessments and judgments, is, under the principles laid down by the supreme court in the present case, estopped to deny their existence and validity, to the same extent that it is estopped from setting up the issue of bonds under the act of 1872 as a discharge of its general liability as trustee with reference to the fund. As an original question, however, the authorities seem to affirm the liability of a municipal corporation for its proportion of the cost of local improvements, independently of the existence of any estoppel. In Re New Orleans Drainage Co., 11 La. Ann. 338, the supreme court of Louisiana held the city of New Orleans liable for assessments made on the area of the streets under the act of 1835, which is similar in all respects to the acts involved here, except that the assessments in

that case had not been ratified by the legislature, as was done in this instance by the act of 1871. This case has since been commented upon and affirmed in Marquez v. City of New Orleans, 13 La. Ann. 319, and Correjolles v. Succession of Foucher, 26 La. Ann. 362, and in Paving Co. v. Gogreve, 41 La. Ann. 259, 5 South. 848. The matter of local assessments has been the subject of judicial inquiry in other states, notably by the supreme court of Illinois in the case of County of McLean v. City of Bloomington, 106 Ill. 209, where all the objections raised in this case have been elaborately considered, and decided in harmony with the case above quoted. Says the court in that case:

"The objections may be included under three heads: First, that public property is exempt from special assessments; second, that the statute under which the state is proceeding does not authorize any assessments against the property of the county; third, that the judgment cannot be enforced by the sale of the property, and no other mode of enforcing such judgments can be resorted to. It is not claimed the first objection has the direct sanction of the statutes in its support, but the contention is such property is expressly exempt from taxation, and special assessments are included within the meaning of the word 'taxation.' We have been too long and too firmly committed to the doctrine that exemption from taxation does not exempt from special assessments to now admit that it is even debatable. * * * The distinction between taxation and special assessments is also clearly made in our present constitution, and while providing that the general assembly may exempt the property of the state, counties, and other municipal corporations from the former, makes no such provision in regard to the latter, but on the contrary * * * authorized the general assembly to vest the corporate authorities of cities, towns, and villages with power to make local improvements by special assessments, without any restriction as to the property to be assessed. The second objection rests entirely on the assumption that, to include the property of counties, it should be expressly named, and that language, however comprehensive, in general terms only, is not sufficient. The rule held by this court is directly the reverse of this assumption. The exemption, and not the inclusion, must specifically appear. * * * The question relates solely to the right of the state to apportion the public burden upon public property, in common with private property, in proportion to the benefit conferred upon that property. The remaining question, we think, involves no serious difficulty, although at first blush it may seem to do so. We certainly do not hold the court-house square may be sold, and title passed to private parties or to the city. In Taylor v. People, 66 Ill. 322, we held that in such cases the amount should be paid out of the treasury. The distinction here made between taxes and local assessments has been fully recognized by the supreme court of Louisiana in Charnock v. Levee Co., 38 La. Ann. 326, and in Paving Co. v. Gogreve, 41 La. Ann. 263, 5 South. 848, where the Drainage Case in 11 La. Ann. 338, is cited with approval."

Whether the obligation for these drainage assessments had its origin in the original acts of 1858, 1859, and 1861, or was cast upon the city by the act of 1871, confirming the assessment rolls, upon which the city was named as a debtor, or results from judgments based on these rolls, the amount of the assessments constitutes a lawful debt of the city, which must be discharged by the exercise of the power of taxation; such power being the usual, and in most instances the only, method by which municipal corporations can discharge their indebtedness. U. S. v. City of New Orleans, 98 U. S. 381; Wolff v. City of New Orleans, 103 U. S. 358.

It is urged, however, that the contracts of purchase made in 1876 are null and void, because they operated to increase the debt of the

city, in violation of the amendment of the constitution of the state adopted in 1874. This assumption is based on the theory that assessments against the city were at that time void, and that to now enforce them would be to increase the city debt. It is said, also, that the city was not at that time the primary debtor for assessments against private property, and that, if the court should now impose a liability on the city for the dereliction of duty charged in the bill, it would create a new debt, which will come within the prohibition. We cannot concede the correctness of this argument. It is true the amendment prohibited any increase of the city debt after January 1, 1875; but it also expressly provided that it should not prevent the issue of drainage warrants to the transferee of the contract, under Act No. 30 of 1871, payable out of the drainage taxes. But it seems clear to us that by express terms the amendment excludes, and intended to exclude, from its operation, the liability of the city growing out of its relation to drainage matters, including the city's liability as assessee of the streets and public places, as shown by the assessment rolls. Indeed, it would seem that the authority to issue warrants against the drainage fund after that date necessarily implied an affirmance of the right of the city to proceed to the completion of the drainage work then in progress, and imposed a corresponding duty on the city to collect and apply all the drainage assessments to the payment of the warrants. These taxes, being then liabilities of the city, cannot by any cause or reason be included in the clause prohibiting an increase of the debt of the corporation without imputing to the authors of the constitution an intent to defraud those who might deal with it under the invitation of the constitution. We cannot give to the organic law of the state a construction so repugnant to honesty and good morals; nor do we believe the legislature, in authorizing the city to purchase the property of the transferee of the canal company, nor the city, in making the purchase for the purpose of carrying on and completing the drainage, contemplated defrauding the vendor by invoking any such inequitable construction. Even admitting that the purchase created a debt in excess of the limitation, the most that can be said is that it was made in error of law, which, according to article 1846 of the Civil Code of Louisiana, cannot be alleged to acquire the property of another. This principle is embedded in the civil law, as shown by the learned disquisition of D'Auguesseau, to be found in the second volume of Poth. Obl. p. 350. The same principle is recognized by the supreme court in Railway Co. v. McCarthy, 96 U. S. 258, in which the court says that a corporation, having enjoyed the fruits of a contract fairly made, cannot, when called to account, deny the corporate power to make it.

The only remaining question which requires consideration is the plea of prescription, and that, we think, cannot be maintained. The act of sale created an express trust, in which the city undertook, as a trustee, to collect and apply the drainage assessments to the payment of the warrants given for the price of the property sold to it. This trust was a continuing and executory one, and the universal rule in such cases is that the statute of limitations is not set in motion until the trustee has disavowed the trust, and notice of his repudia-

tion has been brought home to the cestuis que trustent. Perry, Trusts, § 24; Lewis v. Hawkins, 23 Wall. 119. This rule has been expressly recognized and applied by the supreme court of Louisiana in Insur- ance Co. v. Pike, 32 La. Ann. 483, where it is held that prescription against the right to demand an accounting begins to run only from the date of the last act performed by the trustee with reference to the trust. In that case the act which was held to be a recognition of the trust consisted of a credit entry, for money collected, made by the defendant in the books of the insurance company, of which he was treasurer. In the present case the city alleges in its answer that it has constantly endeavored, by suits and otherwise, to collect the drainage assessments, thus affirming the trust, and has filed an ac- count showing the collection of the assessments up to June 20, 1891, —only three years prior to the date of the bill filed. Notwithstand- ing these facts, it is still insisted that the judgments against the city are prescribed, under the laws of the state, because they have not been revived within 10 years since their rendition, even if the city has continued to act as trustee up to the time of the filing of the bill. We cannot understand upon what theory the city can claim a release from its indebtedness to the drainage fund by pleading its own neg- lect to revive the judgments, if the proceedings to revive were neces- sary to keep them in force. Such a pretension has neither the sanc- tion of reason nor authority. On the contrary, the maxim, "Contra non valentem," is universally applied as between a trustee and an estate represented by him. And so in this state it has been held that neither a claim of an administrator against the estate he repre- sents, nor the claims of the estate against him, are subject to pre- scription, as long as he remains a trustee. In re Farmer, 32 La. Ann. 1037; McKnight v. Calhoun, 36 La. Ann. 408. The reason given by the court for the application of the maxim in these cases is that an administrator, from the very nature of things, cannot sue himself, if a debtor to the estate, nor sue the estate, of which he is the sole representative, if he is a creditor. Moreover, it is doubtful whether statutory assessments of the character in question are subject to any prescription at all. Indeed, the supreme court of the state has held in Reed v. His Creditors, 39 La. Ann. 115, 1 South. 784, citing State v. Jackson, 34 La. Ann. 178, and Davidson v. Lindop, 36 La. Ann. 765, that, tax laws being sui generis, the prescription of the Civil Code does not apply to them, from which it may be taken, as a general rule in such matters, that, unless a law under which an assessment is levied provides a limitation, none exists.

On a full consideration of the case, we think the decree appealed from should be reversed, and that a decree should be entered by the circuit court in favor of the complainant for the sum of $6,000, with 8 per cent. interest from June 6, 1876, as stipulated in the warrants sued on, and that an account should be taken of all the drainage as- sessments, including those reduced to judgments against the city as assessee of the streets, squares, and other public places, as well as the assessments against private property and persons, allowing credits for the amounts heretofore collected and properly expended, but without allowing for the bonds issued under the act of 1872. Opportunity

should be given the holders of outstanding purchase warrants of the character of those held by the complainant to come before the master on the invitation contained in the bill, and make proof of the amounts due them; and they should be admitted to share in the trust fund, upon offering to contribute to the cost and expenses of the litigation. In accordance with these views, and to prevent any unnecessary delay arising from a misunderstanding of the findings now and heretofore expressed by this court and the supreme court, the circuit court is directed to enter a decree as follows:

"(1) It is decreed that the city of New Orleans is a debtor to John G. Warner, complainant, in the sum of $6,000, with 8 per cent. interest thereon from June 6, 1876, as stipulated in the warrants sued on, and that he is entitled to be paid said sum, in principal and interest, out of the drainage assessments set forth in the bill filed herein.

"(2) The said drainage assessments, including those against the defendant as assessee of the streets, squares, and public places, as well as those against the owners of private property, be, and the same are hereby, declared to constitute a trust fund in the hands of the city of New Orleans for the purpose of paying the claims of complainant and other holders of the same class of warrants issued under the act of sale from Warner Van Norden, transferee to said city, under authority of Act No. 16 of the legislature of the state of Louisiana, approved February 24, 1876.

"(3) That it be referred to one of the masters of the court to take and state an account of all said drainage assessments, and for that purpose he is authorized to require the production before him of the assessment rolls and other records appertaining to such drainage assessments, by any person having possession thereof, and to examine witnesses touching all such matters. In taking and stating such account the master is directed to charge the defendant as well with the amount of drainage assessments against the city, the area of the streets, squares, and public places, as with those against the owners of private property, with interest thereon as prescribed by law, and to give credit only for the sums already collected and properly expended by the defendant in the execution of the trust, but that no offset be allowed for the bonds issued in exchange for drainage warrants under the act of 1872.

"(4) It is further ordered that said master give 30 days' notice, by advertisement in a newspaper published in New Orleans, to all holders of warrants issued as aforesaid, to appear before him and establish their claims. And it is further ordered that said warrant holders be entitled to establish their claims before the master in the first instance, without being required to file formal interventions, or to obtain special leave of court, and that they be entitled, upon making satisfactory proof, to the full benefit of the proceeding.

"(5) It is further decreed that upon the coming in of the master's report, and its confirmation, the complainant and all those who have established claims under the fourth clause of this decree will be entitled to an absolute decree against the defendant for the amounts found due them, if the fund established by the accounting shall be sufficient, but, if not sufficient to pay such claims in full, then for the

proper pro rata thereof, and shall be entitled to have execution thereof. It is further ordered that the complainant and all other parties in interest have leave to apply to the court for such other and further orders as may be necessary, from time to time, to carry this decree into full effect, and that the defendant pay all costs of this suit."

For the purpose of awarding the relief to which the complainant is entitled, the decree appealed from is reversed, at the costs of the appellee, with directions to the circuit court to enter the decree herein prescribed, and otherwise to proceed in the cause in accordance with this opinion.